**FILED**

U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

Jan 27, 2023

Tammy H. Downs, Clerk
By: LaShawnColeman D.C.
DEP CLERK

4:23-MJ-00014-JTK

**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JAN 2 5 2023

MITCHELL R. ELFERS
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. $23-92\,KWR$ |
| | ) | |
| vs. | ) | Count 1: 18 U.S.C. § 242: Deprivation of |
| | ) | Rights Under Color of Law; |
| **MARQUET JOHNSON,** | ) | |
| | ) | Count 2: 18 U.S.C. § 924(c)(1)(A)(ii): |
| Defendant. | ) | Using, Carrying, and Brandishing a Firearm |
| | ) | During and in Relation to a Crime of |
| | ) | Violence, and Possessing and Brandishing a |
| | ) | Firearm in Furtherance of Such Crime. |

INDICTMENT

The Grand Jury charges:

Introduction

At all times relevant to this Indictment:

1.      The defendant, **MARQUET JOHNSON**, worked as a prisoner transport officer for

Inmate Services Corporation ("ISC").

2.      Local jails and prisons throughout the United States of America hired ISC to

transport individuals who were arrested pursuant to out-of-state warrants.

3.      The defendant, **MARQUET JOHNSON**, transported these individuals to the

jurisdictions that initially issued the warrants.

4.      The defendant, **MARQUET JOHNSON**, by virtue of working as a prisoner

transport officer for ISC, was required to act in compliance with federal, state, and local laws,

including the United States Constitution.

1

5.    T.P. was a female in custody, arrested on an out-of-state warrant, whom the defendant, **MARQUET JOHNSON,** while acting as a prisoner transport officer, transported from Santa Fe, New Mexico to Delta County, Colorado.

6.    Paragraphs One through Five are incorporated by reference in the counts below.

<u>Count One</u>

7.    On or about November 4, 2019, in Bernalillo County, in the District of New Mexico, the defendant, **MARQUET JOHNSON,** while acting under color of law, willfully deprived T.P. of her fundamental right to bodily integrity, a right secured and protected by the Constitution and laws of the United States, when he penetrated T.P.'s vulva with his penis without her consent and without a legitimate law enforcement purpose, and the defendant's conduct included the use of a dangerous weapon and aggravated sexual abuse.

In violation of 18 U.S.C. § 242.

<u>Count Two</u>

8.    On or about November 4, 2019, in Bernalillo County, in the District of New Mexico, the defendant, **MARQUET JOHNSON,** knowingly used, carried, and brandished a firearm, during and in relation to a crime of violence for which the defendant may be prosecuted in a court of the United States, to wit: the willful deprivation of T.P.'s right to bodily integrity under color of law, including the use of a dangerous weapon and aggravated sexual abuse, as charged in Count 1 of this indictment, and in furtherance of such crime of violence, possessed and brandished said firearm.

In violation of 18 U.S.C. § 924(c)(1)(A)(ii).

2

A TRUE BILL:

_____
FOREPERSON OF THE GRAND JURY

ALEXANDER M.M. UBALLEZ
United States Attorney

_____
KIMBERLY BRAWLEY
Assistant United States Attorney

KRISTEN M. CLARKE
Assistant Attorney General
Civil Rights Division, U.S. Department of Justice

_____
LAURA B. GILSON
Trial Attorney
Criminal Section, Civil Rights Division

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.    CR 23-0092 KWR |
| | ) | |
| MARQUET JOHNSON | ) | |
| | ) | |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    MARQUET JOHNSON ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment    ❑ Superseding Indictment    ❑ Information    ❑ Superseding Information    ❑ Complaint
❑ Probation Violation Petition    ❑ Supervised Release Violation Petition    ❑ Violation Notice    ❑ Order of the Court

This offense is briefly described as follows:

Count 1: 18 U.S.C. § 242: Deprivation of Rights Under Color of Law;

Count 2: 18 U.S.C. § 924(c)(1)(A)(ii): Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence, and Possessing and Brandishing a Firearm in Furtherance of Such Crime.

Date:    01/25/2023

*N. Maestas*
*Issuing officer's signature*

City and state:    Albuquerque, New Mexico

Mitchell R. Elfers, Clerk of Court
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____<br>at *(city and state)* _____ . |
| Date: _____ |
|                                          *Arresting officer's signature* |
|                                          *Printed name and title* |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

**United States of America**                                              **Plaintiff**

**v.**                                    **Case No.: 4:23–mj–00014–JTK**

**Marquet Johnson**                                                       **Defendant**

_____

### NOTICE OF HEARING

     PLEASE take notice that a Initial Appearance has been set in this case for January 31, 2023, at 10:15 AM before Magistrate Judge Jerome T. Kearney in Little Rock Courtroom # 4C in the Richard Sheppard Arnold United States Courthouse located at 600 West Capitol Avenue, Little Rock, Arkansas.

**DATE:** January 27, 2023                  AT THE DIRECTION OF THE COURT
                                                        TAMMY H. DOWNS, CLERK

                                          **By:** LaShawn M Coleman, Deputy Clerk

Electronic copy provided to:

U.S. Marshals Service, Eastern District of Arkansas
U.S. Probation Office, Eastern District of Arkansas
Court Security Office, Eastern District of Arkansas

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


UNITED STATES OF AMERICA        )
                                )
v.                              )        NO. 4:23MJ00014
                                )
MARQUET JOHNSON                 )
                                )
                                )


## UNITED STATES NOTICE OF ENTRY OF APPEARANCE

The undersigned counsel for the United States hereby makes an entry of appearance in the above captioned matter.


Respectfully submitted,

JONATHAN D. ROSS
UNITED STATES ATTORNEY


STEPHANIE MAZZANTI
Bar. 2006298
Assistant U.S. Attorney
P.O. Box 1229
Little Rock, AR 72203
501-340-2600
Stephanie.Mazzanti@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:23-MJ-14 |
| | ) | |
| MARQUET JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' MOTION FOR DETENTION PENDING TRIAL

The United States, by and through undersigned counsel, respectfully moves this Court to detain the Defendant pending trial.  The Defendant, a former prisoner transport officer, faces a two-count indictment based on allegations that he sexually assaulted a female detainee in his custody, at gun point, at a rest stop in Albuquerque, New Mexico, during a prisoner transport trip from Santa Fe, New Mexico to Delta County, Colorado.  Specifically, the Defendant is charged with violating 18 U.S.C. § 242 (Deprivation of Rights including the Use of a Dangerous Weapon and Aggravated Sexual Abuse) and 18 U.S.C. § 924(c) (Using, Carrying, and Brandishing a Firearm During a Crime of Violence).  Therefore, pursuant to 18 U.S.C. § 3142(e)(3)(B), there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the Defendant and the safety of the community

In addition, as set forth below, there is clear and convincing evidence that the Defendant is a danger to the community. The Defendant is alleged to have used his official position, as a prisoner transport officer, to sexually assault the victim, T.P., at gun point.  There is also considerable evidence that, while working as a prisoner transport officer for Inmate Services Corporation (ISC), from about February 2019 to March 2020, the Defendant sexually assaulted at

1

least another 10 female detainees in his custody, through use of physical force, kidnapping, and threats. The Defendant was tasked with upholding the Constitution and keeping the detainees in his custody safe. He did the opposite. The Defendant violated his duty of care and the victims' constitutional rights with impunity, and rendered these prisoner transports unsafe due to his own predatory conduct. The Defendant cannot be trusted to abide with any conditions of release, nor can any conditions adequately protect the victims, other witnesses in this case, or the public.

## I.       FACTUAL & PROCEDURAL HISTORY

### A.  The Indictment

On January 24, 2023, a grand jury sitting in the District of New Mexico charged the Defendant with violating 18 U.S.C. § 242 and 18 U.S.C. § 924(c). The § 242 charge (Count One), alleges that the Defendant, while acting under color of law, willfully deprived T.P., a female detainee in his custody, of her constitutional right to bodily integrity when he penetrated T.P.'s vulva with his penis without her consent and without a legitimate law enforcement purpose. The grand jury found that the Defendant's conduct included the use of a dangerous weapon and aggravated sexual abuse. The § 924(c) charge (Count Two), alleges that the Defendant knowingly used, carried, and brandished a firearm, during and in relation to a crime of violence charged in Count One. Count One carries a maximum penalty of life in prison. Count Two carries a mandatory seven-year consecutive sentence and a maximum of life in prison.

### B.  Factual Summary

The Defendant worked as a prisoner transport officer for ISC, a private prisoner transport company, located in West Memphis, Arkansas. Local jails and prisons throughout the United States hired ISC to transport individuals who were arrested pursuant to out-of-state warrants. The Defendant transported these individuals in white passenger vans to the jurisdictions that initially

issued the warrants.  As detailed below, although the Indictment only charges the Defendant for his sexual assault of T.P. in New Mexico (NM), the Defendant's actions are part of a pattern of sexual misconduct that started before T.P.'s transport and continued thereafter.

*1.   The Defendant's Charged Conduct*

On November 4, 2019, the Defendant and another ISC prisoner transport officer, J.J., picked T.P. up around 2:30 a.m., from the Santa Fe County Jail in Santa Fe, NM to transport her to Delta County, Colorado (CO) on an outstanding warrant.  The Defendant and J.J. transported T.P. in a white Chevrolet van with two bucket seats upfront and rows of bench seating behind.  At the time of T.P.'s pickup, there were three other male detainees in the van, who sat on the bench row furthest in the back, while T.P. sat on the bench row behind the officers' bucket seats.

About an hour into T.P.'s transport, the van stopped at the Metropolitan Detention Center (MDC) in Albuquerque, NM to drop off the three male detainees.  When the transport reached the MDC, J.J. brought the male detainees into the facility while the Defendant remained alone with T.P. inside the van.  The Defendant then began to make sexual comments to T.P., asking her whether she had a boyfriend.  T.P. replied that she was married, to which the Defendant responded, "that's a shame," and alluded to wanting to see T.P's "ass."  T.P. felt uncomfortable and asked to use the restroom.  The Defendant asked T.P. whether she could wait until the next rest stop, but T.P. claimed she could not, because she felt uncomfortable being alone with the Defendant.  The Defendant then escorted T.P. inside the MDC to use the restroom.  Federal investigators obtained MDC security footage from November 4, 2019, which corroborates that at 4:20 a.m., a white transport van arrived at the jail and three male detainees were escorted inside the jail by an officer. The footage further corroborates that at approximately 5:31 a.m., a female detainee (T.P.) gets off the van and is escorted inside the jail by a different officer (the Defendant).

After leaving the MDC, the transport drove a few minutes before the Defendant told J.J. to stop for breakfast.  J.J. stopped at a gas station with an attached Carl's Jr. restaurant, and then went inside the Carl's Jr. to buy breakfast, while the Defendant remained alone with T.P. inside the van. As soon as J.J. walked away from the van, the Defendant told T.P. to move to the bench row in the back of the van.  T.P. did so; the Defendant then also climbed into the back of the van and sat next to T.P.  The Defendant told T.P. to lift her feet, and then removed T.P.'s ankle restraints and loosened her handcuffs, leaving her belly chain in place.  The Defendant remarked that T.P. had "pretty feet."  T.P. told the Defendant that she was unsure what was going on, but that she did not want "to do this."  In response, the Defendant pulled out a short black gun, and, while resting the gun on his lap, told T.P. that he wanted her to cooperate with him, "otherwise, it was going to get ugly."

The Defendant ordered T.P. to remove her pants and underwear from one side of her body. T.P. did so, but again told the Defendant that she did not want to do this.  The Defendant ignored T.P.'s statement and told her to lay down on her back with her legs towards him.  The Defendant then crawled on top of T.P. and rested his gun against her cheek.  T.P. felt terrified, partially closed her eyes in fear, and focused on hoping to see her children again. The Defendant then put his mouth on T.P.'s stomach, before pulling his penis out of his pants zipper and using it to penetrate T.P.'s vagina.  The Defendant told T.P. to keep quiet and asked her whether she could have children. When T.P. said she could not, the Defendant told her that he was going to "come inside" her, and that she should "love on his dick."  The Defendant then ejaculated inside of T.P.'s vagina.

A moment later, T.P. felt the Defendant's chest move off her chest and the gun move away from her cheek.  The Defendant told T.P. to hurry up and put her pants back on.  T.P. was still struggling to put on her pants when J.J. got back into the van with breakfast burritos.  J.J. got into

4

the driver seat while the Defendant remained in the back of the van with T.P. The Defendant then wrote a note, with what T.P. believed was his last name, "Cross," and a phone number, and placed the note in T.P.'s back pants pocket. The Defendant then told T.P. that she could move up in the van because he was going to sleep in the back. T.P. moved back up to the bench row behind the officer seats. Federal investigators obtained trip receipts and records from the underlying transport, including a receipt from a Carl's Jr. restaurant in Albuquerque for three breakfast burritos, dated November 4, 2019, at 5:57 a.m. Federal investigators also obtained cell site data, pursuant to a federal search warrant, placing the Defendant, on November 4, 2019, at the Santa Fe County Jail around 2:30 a.m., the MDC around 4:00 a.m., and an Albuquerque gas station with an attached Carl's Jr. around 5:57 a.m.

At some point later, the transport stopped at another rest stop. The Defendant then moved up in the van and slipped a bottle of soap and a washcloth into T.P.'s sweatshirt pocket, whispering to her to go clean herself in the bathroom. J.J. brought T.P. inside the rest stop while the Defendant remained in the van. T.P. went into the bathroom but did not wash off, because she wanted to preserve evidence of the assault. When T.P. returned to the van, the Defendant told her to throw the soap and washcloth into the back of the van; T.P. did so. Additional trip receipts obtained by federal investigators and cell site data corroborate that the transport van made stops in Nageezi, NM, Montrose, CO, and Delta, CO.

When the transport van arrived at the Delta County Jail, around 1:30 p.m., on November 4, 2019, the Defendant brought T.P. inside and transferred custody of her to the booking officer, to whom T.P. disclosed the sexual assault and asked for a rape kit. A Delta County Sheriff's Office (DCSO) detective then interviewed T.P., and T.P. underwent a Sexual Assault Nurse Examiner's (SANE) exam. As part of the exam, the nurse examiner collected vaginal swabs from T.P.

Because the rape occurred in New Mexico, the New Mexico Department of Public Safety Forensic Laboratories conducted a forensic analysis of those swabs. That analysis revealed the presence of male DNA from semen, which matched the Defendant's DNA that was collected by federal investigators, pursuant to a federal search warrant, via a buccal swab. In addition, during the SANE exam, DCSO investigators collected T.P.'s clothing, and found the note from the Defendant inside T.P.'s pants pocket. Federal investigators obtained this note from the DCSO and verified that the phone number written on it belongs to the Defendant.

## 2. The Defendant's Additional Sexual Misconduct

During the course of their investigation, federal investigators obtained and executed a premises search warrant for ISC headquarters in West Memphis, Arkansas, looking, among other things, for records of other ISC transports that the Defendant conducted. Investigators reviewed the records and identified transports that the Defendant conducted for ISC that included female detainees. To date, federal investigators have interviewed 10 additional women who have articulated that the Defendant engaged in some form of unwanted sexual contact with them during a prisoner transport, be it groping, oral sex, or vaginal penetration. Their accounts are summarized in chronological order below.

**L.P. -** Eight months before he transported T.P., the Defendant transported L.P., a female detainee, in March 2019, from Indianapolis, Indiana to Munfordville, Kentucky. At the time of her transport, L.P. was six months pregnant, and she sat on the front bench row behind the officers' bucket seats. A few hours into L.P.'s transport, the transport van stopped at a rest stop, and when L.P. got out of the van, the Defendant told her, "Damn, girl. I didn't get to see you when they picked you up, but I see you now." After resuming the transport, the Defendant and his transport officer partner dropped off all the other detainees onboard the van other than L.P. The Defendant and his transport officer partner then asked L.P. whether she wanted to watch a movie, and she

6

picked "Bonnie and Clyde," but then asked to go lie down on a back-bench row.  After L.P. climbed onto the back-bench row, the Defendant followed and sat beside her.  The Defendant removed L.P.'s handcuffs, and began to rub her shoulders and upper thigh, telling her that he was attracted to her because she was pregnant.  The Defendant then repeatedly asked L.P. whether he could use her "belly" as a pillow.  L.P. repeatedly said, "No!"  The Defendant finally said, "Fuck it," and climbed back up to the passenger seat.  L.P. felt "all alone" during the incident, and that the Defendant had "forced himself on her."  As soon as L.P. was dropped off, L.P. told a jailer what had happened on the transport, and the jailer told her to write a statement.  L.P. wrote a statement, detailing the Defendant's touching of her, which federal investigators found inside ISC headquarters while executing the premises search warrant.

**M.J.** – Seven months before he transported T.P., the Defendant transported M.J., a female detainee, in April 2019, from Kansas City, Missouri to Jonesboro, Arkansas.  M.J. sat on the front bench row behind the officers' bucket seats, and, at some point in the transport, the Defendant reached back from his passenger seat and removed M.J.'s restraints.  The Defendant then gestured towards his penis and told M.J. to "get down here."  M.J. refused, but the Defendant said she had to or would be "in trouble."  When M.J. still did not agree, the Defendant reached back and grabbed M.J.'s head, forcing it down and against his penis.  The Defendant then placed his jacket over M.J.'s head and used his forearm to hold her in place.  Feeling that she had no choice, M.J. performed oral sex on the Defendant until he ejaculated in her mouth.  After he ejaculated, the Defendant pushed M.J. back upright, and she spat out the semen.  Similar to his pattern of behavior with T.P., when the Defendant dropped M.J. off in Arkansas, he handed her a piece of paper with his phone number on it and told her to call him if she ever needed a place to stay.  M.J. threw out

the paper and never told anyone about the assault.  M.J. also saw the Defendant carrying a gun during the transport.

**W.P.** – Six months before the Defendant transported T.P., he transported W.P., a female detainee, in May 2019, from Sisseton, South Dakota to New Braunfels, Texas.  Partway through W.P.'s transport, the transport officers conducting the transport switched out, and the Defendant took over as one of W.P.'s transport officers.  After the Defendant took over the transport, he routinely bought the detainees cigarettes and alcohol, which W.P. declined.  The Defendant also began paying more attention to W.P., asking her whether she was married, complimenting her, and telling her about his life.  At some point, the transport stopped at a rest stop, and the Defendant brought W.P. into the women's restroom, where he showed her the gun that he carried in his ankle holster.  At another rest stop, the Defendant again brought W.P. into the women's restroom, and told her that since she was not going to be with a man for a while, they should do it.  The Defendant opened his pants and "pushed her head down."  W.P. thought, "what if I say no, he has a gun, and we're alone in here."  W.P. performed oral sex on the Defendant.  The oral sex was forceful because the Defendant could not ejaculate and so he kept moving W.P.'s head, but she kept gagging.  Eventually the Defendant told her it was taking too long and moved away from W.P. W.P. recalled giving the Defendant oral sex on more than one occasion before he dropped her off.

Similar to his pattern of behavior with T.P., when the Defendant dropped off W.P., he gave her a piece of paper with his number on it and told her to call him.  W.P. called the Defendant while she was in jail several times, and he wrote her two letters to her in jail.  After she was released from jail, the Defendant came and visited W.P. in Colorado several times.  On three occasions, they rented a hotel room together and had vaginal intercourse.  W.P. "compartmentalized" what

she went through and stated that when she gave the Defendant oral sex the first time it was not consensual and that she now sees his conduct as "grooming."

**K.N.M.** – Four months before the Defendant transported T.P., he transported K.N.M., a female detainee, in July 2019, from Spencer, Indiana to San Marcos, Texas.  K.N.M. sat on the front bench row behind the officers' bucket seats, and, after a few days on the transport, the Defendant reached back from his passenger seat and removed K.N.M.'s handcuffs.  At some point later, the Defendant climbed back from his passenger seat and sat beside K.N.M. The Defendant then began touching and rubbing K.N.M.'s thigh.  K.N.M. removed the Defendant's hand and kept trying to move into the other transport officer's line-of-sight.  K.N.M. found the Defendant's touching triggering because she was raped when she was 15 and feared what the Defendant would do next.

While driving through what K.N.M. believed was Missouri, K.N.M. asked to use the bathroom.  The Defendant told the other transport officer to stop the van at the ISC office, which is located in West Memphis, Arkansas.  When the transport van stopped, the Defendant brought K.N.M. inside to use the bathroom.  After K.N.M. exited the bathroom, the Defendant immediately turned off the lights, grabbed K.N.M. from behind, and told her that there were no cameras inside the building.  K.N.M. could feel the Defendant fiddling with his pants, and believed the Defendant was about to be rape her.  K.N.M. felt terrified of getting injured because after her previous rape, she had to undergo multiple surgeries.  In a panic, K.N.M. told the Defendant to "just let her take care of him."  The Defendant pushed K.N.M.'s head down and put his penis in her mouth.   K.N.M. performed oral sex, which was painful because the Defendant grabbed her hair and jammed his penis down her throat.  The Defendant ejaculated in K.N.M.'s mouth.  K.N.M. tried to spit out the semen, but the Defendant forced her to swallow it.  Afterwards, the Defendant walked K.N.M.

9

back out to the van.  Of note, federal investigators interviewed the Defendant's transport partner, who corroborated that during this transport, the transport stopped at the ISC office in West Memphis, Arkansas for a restroom stop.

A short time later, the transport picked up another female detainee, S.J., and the Defendant then climbed from his passenger seat and sat between K.N.M. and S.J.  The Defendant then alternated trying to rub K.N.M. and S.J.'s legs, and both women kept trying to move his hand away.  The officers dropped K.N.M. off a day or so later, and she did not tell anyone about the sexual assault.  While still in custody, the Defendant messaged K.N.M. on Facebook Messenger. K.N.M. saw the messages after being released, and exchanged a few messages with the Defendant, thinking that he was another male detainee from the transport.  After exchanging a few messages, the Defendant called K.N.M. over Messenger, and when K.N.M. heard his voice, she realized it was not a detainee but the officer who assaulted her.  K.N.M. ended the call.  K.N.M. kept these messages and provided copies to federal investigators.

**P.B.** – Three months before the Defendant transported T.P., he transported P.B., a female detainee, in August 2019, from Baker County, Oregon to Johnson County, Missouri.  P.B. sat on the front bench row behind the officers' bucket seats, and, during the first day of her transport, the Defendant turned around from his passenger seat, removed P.B.'s restraints, and tried to rub her feet and legs.  P.B. felt uncomfortable and tried to move out of his reach.  After a few days on the transport, P.B. was the only detainee who had not yet been dropped off.  P.B. fell asleep, and woke up at an unknown office building to the Defendant and his transport partner cleaning out the van. After they finished cleaning, the Defendant climbed back into the van, while his transport partner got into a separate car and drove away.  Of note, federal investigators interviewed the Defendant's transport partner, who corroborated that during this transport, the van stopped at the ISC office in

West Memphis, Arkansas, and the Defendant told him that they would split up, with the Defendant transporting the female detainee alone the rest of the way.

After a few minutes of resuming the transport, the Defendant reached back and rubbed P.B.'s feet and legs, and then asked her to do sexual things to him. P.B. refused and told the Defendant that she was uncomfortable. The Defendant did not respond but, a short time later, pulled the transport van into a hotel parking lot, located just off a highway in Bolivar, Missouri. The Defendant then left P.B. in the van, while he went inside the hotel and rented a room. P.B. considered trying to run away but was afraid of getting into more legal trouble. Records obtained from the Super 8, located in Bolivar, Missouri, confirm that the Defendant rented a king room, number 227, on August 21, 2021, checking in at 3:03 a.m.

The Defendant brought P.B. inside the hotel room and told her to shower. P.B. showered and redressed in the bathroom. The Defendant then went into the bathroom and showered. While the Defendant showered, P.B. sat on the edge of the bed and watched television. Minutes later, the Defendant came out of the bathroom, wearing only boxers and a t-shirt. P.B. stood up from the bed, but the Defendant walked over and grabbed her, pushing her to lay down, face up, on the bed. The Defendant then took off P.B,'s clothing, climbed on top of her, and penetrated her vagina with his penis for 10-15 minutes. P.B. felt totally powerless. When the Defendant finally climbed off her, P.B. went into the bathroom to clean herself.

The Defendant then brought P.B. back outside to the van and put her in the front passenger seat. The Defendant resumed the transport, but, a short time later, asked P.B. for oral sex. P.B. refused, but the Defendant asked her again and again, until she relented. The Defendant pulled onto a gravel road, and P.B. performed oral sex on the Defendant. Sometime later, the Defendant

pulled into a store parking lot, handcuffed P.B., and then dropped her off at the Missouri jail.  P.B. never told anyone about the sexual assaults until she spoke with federal investigators.

**C.S.** – Less than a week after the Defendant transported T.P., he transported C.S., a female detainee, in November 2019, from Colorado Springs, Colorado to Rockwell, Texas.  C.S. sat on the front bench row behind the officers' bucket seats, and, during the first day of her transport, the Defendant leaned his passenger seat all the way back and asked C.S. what she wanted to eat.  C.S. asked for "Wendy's," which the Defendant agreed to get her.  He then offered her cigarettes.  A short time later, the Defendant typed multiple sexually explicit messages into his cellphone and showed the messages to C.S.  C.S. felt uncomfortable and tried to sleep.  Because the van was so crowded, she could not lay down on the bench and therefore laid down on the floor between the front bench row and bucket seats.  C.S. fell asleep, but woke up a short time later to the Defendant rubbing her foot.  C.S. felt even more uncomfortable, but also powerless, so she just pulled her foot away and went back to sleep.  C.S. next woke up to the Defendant grabbing her butt.  C.S. panicked because she realized that the van was parked at a rest stop and that she was alone with the Defendant inside the van.  C.S. felt extremely relieved when, moments later, the other transport partner, J.J., and the other detainees walked out of the rest stop and back towards the van.  C.S. believes that if she had stayed in the van for any longer, the Defendant would have tried to have sex with her.  Similar to his pattern of behavior with T.P., when the Defendant dropped C.S. off, he put a piece of paper with his phone number in her property bag and told her to call him when she got out.  C.S. was released from jail a few days later, and after showing the note to her husband and telling him what happened to her, threw the note away.  C.S. also saw the Defendant carrying a gun on this transport.

**K.M.**[1] – Also, less than a week after he transported T.P., the Defendant transported K.M., a female detainee, from Douglas County, Oregon to Fulton County, Kentucky.  K.M.'s transport had two legs: from Oregon to Arkansas and then, after a multiday layover at the Sevier County Jail in Arkansas, from Arkansas to Kentucky.  During the first sexual assault, K.M. sat on the front bench row behind the officers' bucket seats, and the Defendant leaned his passenger seat back, before he began running his hand up her pajama pant leg.  The Defendant then moved her underwear to the side before putting his fingers inside her vagina.  Because K.M.'s vagina felt "dry," the assault was particularly painful, leaving her vagina burning the following day.  Afterwards, the Defendant asked K.M., "you're not going to call that rape, are you?"

For the second sexual assault, K.M. again sat on the bench row behind the officers' bucket seats.  The Defendant turned around from his front passenger seat, sucked on his fingers for lubrication, and then pulled K.M.'s underwear and pants down, before digitally penetrating her anus.  K.M. felt pain and, because she had not defecated in several days, fecal matter came out.  K.M. smelt the feces and felt certain that it was on the Defendant's finger.  K.M. did not fight back during either assault because she thought the Defendant could "do anything from A-Z."  He could "apologize and give [her] candy or he could rape and kill [her]."  Similar to his pattern of behavior with T.P., when the Defendant dropped K.M. off in Kentucky, he gave her a piece of paper with his phone number written on it.

**D.D. –** In the same month that the Defendant transported T.P., he transported D.D., a female detainee, in November 2019, from Cook County, Illinois to Des Moines, Indiana.  After being picked up in Illinois and riding on the transport van for a few hours, the van stopped for a

---

[1] While this investigation was pending, K.M. died in car accident.  Therefore, K.M. can no longer present testimony against the Defendant at trial pursuant to Federal Rule of Evidence 413.  K.M.'s allegations, however, are included in this motion as they demonstrate the dangerousness of the Defendant—that less than a week after sexually assaulting T.P., he sexually assaulted two other pretrial detainees, K.M. and C.S.

restroom stop.  The Defendant asked whether any of the detainees needed to use the restroom, and when D.D. said she did, he brought her inside.  The Defendant walked D.D. into the women's restroom, and D.D. then asked the Defendant if he could take off her handcuffs so she could urinate.  Instead of removing her handcuffs, the Defendant reached over and unzipped D.D.'s pants.  D.D. went into a stall and sat down to pee, but, seconds later, the Defendant followed her into the stall.  The Defendant told her to give him "head."  D.D. said, "No!" and the Defendant then grabbed the back of D.D.'s head and pushed her head against his exposed penis.  The Defendant then held D.D.'s head in place while she gave him oral sex until he ejaculated.  D.D. felt pain and believed that she had no choice but to submit and give the Defendant oral sex.  D.D. believed that if she did not submit, the Defendant would rape and/or beat her.  After the Defendant ejaculated into her mouth, D.D. spit out the semen and he rezipped her pants.  D.D. never told anyone about the assault until she spoke with federal investigators.

**R.G.** – Three months after the Defendant transported T.P., he transported R.G., a female detainee, in February 2020, from Okeechobee, Florida to Gettysburg, Pennsylvania.  R.G. was transported in a white van with two bucket seats, a mat behind the officers' seat—which served as a bed for the officers, a mesh divider behind that bed, and rows of bench seating behind the divider. At some point during the transport, the Defendant moved R.G. from the back of the van to the bed in the van's front compartment.  Thereafter, the Defendant drove the transport van, while his transport partner slept—or feigned sleep as R.G. believed.  While the Defendant was driving, he ordered R.G. to move up next to him, and with his free hand, he took off her restraints.  The Defendant then pulled his pants down, exposed his penis, and told R.G. that she was going to "suck his dick."  R.G. said, "No."  In response, the Defendant grabbed the back of R.G.'s head and held it down against his penis.  R.G. felt that she had no choice as "he was the cop and I was the inmate,"

and gave the Defendant oral sex.  R.G. felt pain because the Defendant pulled her hair, and she kept gagging on his penis.  The Defendant ejaculated into R.G.'s mouth, and R.G. tried to spit the semen out, but the Defendant forced her to swallow it.  After she swallowed his semen, the Defendant told R.G. to lay down and pull her pants down.  R.G. said no and said she had her period.  The Defendant responded that he did not care and wanted to "play" with her.  R.G. did as ordered.  The Defendant then penetrated R.G.'s vagina with his free hand.

At the next rest stop, the Defendant told R.G. not to tell anyone what had happened, saying "keep this between us."  Similar to his pattern of behavior with T.P., when the Defendant dropped R.G. off, he gave her a piece of paper with his phone number on it and told her to call him, so that he would know if she had told anyone about the sexual assaults.  Three days later, R.G. called the Defendant and told him that she did not report him to anyone.  Phone records obtained by federal investigators corroborate that R.G. called the Defendant from the jail.

**B.H. -**  Four months after the Defendant transported T.P., he transported B.H., a female detainee, in March 2020, from Waco, Texas to Gettysburg, Pennsylvania.  B.H. was transported by the Defendant for her entire transport in a white van with a divider, but the Defendant had a different transport partner on the first and second leg of the transport.  During the first leg of her transport, B.H. sat on the front bench row behind the officers' bucket seats, and, less than an hour into her transport, the Defendant leaned his passenger seat all the way back and typed a message onto his cellphone, which he then showed to B.H.  The message asked B.H. whether the Defendant could give her a foot massage.  B.H. felt frozen and did not respond.  A short time later, B.H. covered herself with a blanket.  The Defendant then reached underneath the blanket and grabbed B.H.'s foot.  The Defendant put his hand inside B.H.'s pantleg and rubbed up and down her leg.

B.H. kept trying to pull her leg away but felt trapped. Over the next few days, the Defendant frequently rubbed his hand up and down B.H.'s leg.

During the second leg of her transport, the officers dropped B.H. off at an unknown jail for an overnight stop. When the officers picked her back up from the jail, B.H. was the only detainee on van, and, rather than seat her on the bench row behind the officers' seats, the Defendant sat her in the middle of the van, behind the divider. After a few minutes of driving, B.H. heard the Defendant tell his partner to pull over. When the van stopped, the Defendant got into the back of the van and sat next to B.H. The Defendant began rubbing B.H.'s leg and trying to put his hand inside her waistband. B.H. kept saying, "No!" but that the Defendant was able to get his hand inside her waistband and rub the outside of her vagina. The Defendant then asked B.H. to give him oral sex. B.H. repeatedly said, "No!" to the Defendant's requests for oral sex, and eventually the Defendant gave up, and told his partner to pull back over. The Defendant's transport partner did so, and the Defendant got out of the van and climbed back into the passenger seat. A short time later, the van reached Gettysburg and the officers dropped B.H. off. B.H. never told anyone about the assault until investigators contacted her. Of note, federal investigators interviewed the Defendant's transport partner, who corroborated that during this transport, the Defendant placed a female detainee in the back of the van, asked him to pull over, and then he (the Defendant) moved into the back of the van and stayed there with the female detainee for about 45 minutes.

## II.   LEGAL ARGUMENT

The Defendant repeatedly abused his authority as a prisoner transport officer to target vulnerable victims—female pretrial detainees in his custody and care—for sexual assault. The Defendant's commission of multiple and serious offenses while he was acting in his official capacity demonstrates that the Defendant cannot be trusted to comply with the law, let alone any

conditions of pretrial release.  As detailed below, in addition to a presumption existing in this case for detention, the factors set forth in 18 U.S.C. § 3142(g) also support detention.

The Indictment pending against the Defendant for his sexual assault of T.P., which includes a violation of 18 U.S.C. § 924(c) for his brandishing of a firearm during the sexual assault, triggers a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the [Defendant] as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(B).  The Defendant then bears a limited burden of production to rebut that presumption by presenting evidence that he poses neither a danger to the community nor a risk of flight.  Should the Defendant meet that burden of production, the presumption favoring detention does not disappear.  Instead, it remains a factor for the Court to consider among the other factors set forth in 18 U.S.C. § 3142(g).  *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003).  The § 3142(g) factors include: (1) the nature and circumstances of the crime including whether the crime is a crime of violence . . . or involves a firearm . . .; (2) the weight of the evidence against the [Defendant]; (3) the history and characteristics of the [Defendant]; and (4) the nature and seriousness of the danger to any person and the community that would be posed by [the Defendant's] release."  18 U.S.C. § 3142(g).

Consideration of the § 3142(g) demonstrates that there is clear and convincing evidence that the Defendant is a danger to the community and that there is also a preponderance of evidence that the Defendant is a flight risk.  The Eighth Circuit has recognized that either danger to the community or risk of flight is sufficient to authorize detention.  *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986) (citations omitted).  Here, both are present.

17

## A.  **Nature and Circumstances of the Offenses Charged**

The nature and circumstances of the offenses charged are profound and support detention. The charged crimes are egregious, involving both a crime of violence and the use of a firearm.  *See* 18 U.S.C. § 3142(g)(1).  As set forth above, the Defendant is alleged to have exploited his power and position as a prisoner transport officer to brutally victimize a pretrial detainee who was in his care and custody.  When the victim tried to get the Defendant to stop, he pulled out a firearm, told her to cooperate or it was going to "get ugly," and, holding the firearm to the victim's head, raped her.  Thereafter, the Defendant gave the victim soap and a washcloth and told her to clean herself inside the next rest stop, thereby trying to erase evidence of his violent criminal conduct.

In addition, as set forth above, the United States obtained evidence that the Defendant sexually assaulted at least 10 other women whom he transported for ISC.  The Defendant is alleged to have done so through force, kidnapping, and threats, and he repeatedly tried to erase evidence of his sexual misconduct, by forcing the victims to either swallow his semen, having them clean themselves after the assault, or telling them not to tell anyone about the assault.  The depraved nature of both the charged and uncharged assaults, as well as the Defendant's attempts to erase evidence of his misconduct demonstrates the Defendant's disregard for the victims and the law.

Moreover, the seriousness of the Defendant's crime is reflected in the sentences he faces if convicted.  The Defendant faces life imprisonment for his violation of 18 U.S.C. § 242, including the use of a dangerous weapon and aggravated sexual abuse, as well as an additional seven-year consecutive sentence for his violation of 18 U.S.C. § 924(c).

## B.  **The Weight of the Evidence Against the Defendant**

The weight of the evidence supports detention as it demonstrates the Defendant's dangerousness.  *See United States v. Gladney,* No. 2:22-CR-00011-01-BSM, 2022 WL 1616559, at *3 (E.D. Ark. May 20, 2022) (citing *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010)

(noting that the weight-of-evidence factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt")); *see also* 18 U.S.C. § 3142(g)(2).  The pattern of the Defendant's predatory behavior that has emerged favors detention, and the Defendant's guilt is overwhelming.  In addition to DNA evidence, medical records, cell site data, business records, and outcry witnesses corroborating T.P., Federal Rule of Evidence 413 presumes the admissibility of evidence of other sexual assaults to be used for any matter "to which it is relevant," including propensity, when the defendant is charged with a sexual assault.  Fed. R. of Evid. 413.  That is to say, that even if the United States does not ultimately seek additional charges in other jurisdictions, Rule 413 allows the United States to introduce evidence of uncharged sexual assaults to prove the Defendant's propensity to commit sexual assault.  *See United States v. Crow Eagle*, 705 F.3d 325, 327 (8th Cir. 2013) ("The purpose of [Rule 413] evidence is to show the defendant's propensity to commit a similar act of sexual assault."); *United States v. Batton*, 602 F.3d 1191, 1196 (10th Cir. 2010) (finding that Rule 413's allowance of using evidence of prior sexual assaults to prove propensity is "based on the premise that evidence of other sexual assaults is highly relevant to prove propensity to commit like crimes") (quoting *United States v. Enjady*, 134 F.3d 1427, 1431 (10th Cir. 1998)).

Moreover, the federal investigation into the Defendant's sexual misconduct while acting in his official capacity as a prisoner transport officer remains ongoing.  In addition to the 10 victims discussed above, in recent days and weeks, 4 additional women—whom business records corroborate that the Defendant transported for ISC between 2019-2020—have alleged that the Defendant sexually assaulted them during their prisoner transports.  Federal investigators are investigating these women's allegation, and therefore the number of women who may present 413 evidence against the Defendant is likely to increase.

19

### C. **The History and Characteristics of the Defendant**

The United States expects that the Defendant will argue for release because he has little criminal history and is no longer employed as a prisoner transport officer. *See* 18 U.S.C. § 3142(g)(3). As demonstrated by the charges in the Indictment and the uncharged sexual assaults of numerous other female pretrial detainees whom the Defendant transported, neither argument is persuasive. First, although the Defendant's misconduct only came to light in 2019, the evidence developed throughout the federal investigation revealed that the Defendant committed sexual misconduct on numerous occasions for a period of several years, ranging from non-consensual groping to forcible rape. The Defendant's success in evading detection prior to being indicted is not a reason to release him. If anything, it is a reason to detain him.

If this Court were to determine the Defendant's law-abidingness based solely on past convictions, then he appears to be largely law-abiding. But as the facts and evidence bear out, he is anything but law-abiding. In short, it appears that the Defendant is a serial assailant, who, the evidence demonstrates, assaulted numerous women who were entrusted to his custody and care.

### D. **The Nature and Seriousness of the Danger to Any Person or the Community**

Finally, the nature and seriousness of the danger to any person or the community posed by the Defendant's release is significant. *See* 18 U.S.C. § 3142(g)(4). The Defendant is charged with sexually assaulting a female detainee in his custody at gun point. In addition, there are numerous additional and corroborated allegations that the Defendant sexually assaulted other female detainees in his custody, and that he did so through physical force, kidnapping, and threats. The Defendant need not hold an identical official position to perpetrate similar offenses against others. Moreover, in multiple instances, as noted above, the Defendant attempted to maintain contact with

20

his victims, giving them his phone number and telling them to contact him, and contacting at least one victim on social media.

Furthermore, even if the Defendant were ordered not to contact the known victims in this case, a no-contact order would do nothing to protect the additional potential victims, who may still feel too afraid to come forward and whom federal investigators have not yet located.  It would also not protect the many non-victim witnesses the United States has identified, who corroborate the charges and 413 victims' allegations.

As this Court, and others have recognized, those who act under color of law to violate a victim's right to bodily integrity demonstrate that they cannot be trusted to respect the law they were sworn to uphold, let alone conditions of pretrial release.  *See United States v. Kindley*, 4:17-CR-267-DP, Doc. 23 (E.D. Ark. 2018) (detaining the former prisoner transport officer defendant, accused of sexually assaulting a female pretrial detainee, because "[the defendant] poses an unreasonable risk of danger to the community based the seriousness of the allegations as well as the reported history of violence" and "there is a risk of flight based on the sentence he could receive and his extensive interstate travel experience.").  This is undoubtedly true in the present case, where the Defendant has abused his authority, not only to perpetrate a violent sexual offense, but also to engage in an ongoing pattern of sexual misconduct with other female detainees in his care and custody.

As one Court explained:

But given the nature of the alleged underlying conduct, the danger posed to the victims and to the community by any subsequent similar act is severe. And it simply can't be ignored that [the defendant, who was accused of sexually assaulting two women under color of law and with possessing a firearm in connection with the offenses] allegedly committed these offenses while in the line of duty as a police officer. The charges themselves address facts that [the defendant] has demonstrated the intent and ability to conceal and obstruct revelation of his conduct. Likewise, to commit these types of acts—and again, for purposes here, the weight of the

> evidence is strongly against him—he had to disregard and overcome specific legal training in addition to the usual moral and legal constraints against such conduct. It can't be assumed that his future good behavior is in any way assured. The Government has met its burden to show by clear and convincing evidence that no condition or set of conditions of release would guarantee the community's safety.

*United States v. Ruiz*, 2021 WL 1427804, at *4 (S.D. Tex. Apr. 15, 2021); *see also United States v. Dudley*, 22-cr-227-JFH, Doc. 13 (N.D. Okla. 2022) (detaining the former prisoner transport officer defendant, with no criminal history, who was indicted for sexually assaulting a pretrial detainee in his custody on a prisoner transport, based on dangerousness to the community); *United States v. Mitchell*, 22-mj-3273-MD, Doc. 12 (S.D. Fla. 2022) (detaining the officer defendant, with no criminal history, who was indicted for sexually assaulting a minor victim, based on dangerousness to the community).

### E.  The Defendant's Risk of Flight

A judicial determination that a defendant is a risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A), must be supported by a preponderance of the evidence.  *See Abad*, 350 F.3d at 797 ("Assuring a criminal defendant's appearance at trial is a legitimate government objective."). While the crux of the United States' argument for detention is that clear and convincing evidence exists that the Defendant is a danger to the community, Count Two of the Indictment, the § 924(c) charge, also creates a presumption that no condition or combination of conditions will reasonably assure the Defendant's appearance at trial.  Beyond that presumption, several factors support that the Defendant is indeed a flight risk.  First, the gravity of Defendant's charges and the penalties that the Defendant faces for those charges—a sentence of life in prison plus an additional seven-year consecutive sentence—creates a strong incentive for him to flee.  Second, with allegations of numerous additional sexual assaults still under investigation, which could lead to additional criminal charges—including charges of aggravated sexual abuse and kidnapping—in other

districts, the Defendant has little incentive to appear for trial in New Mexico. Third, and finally, the Defendant lacks any ties to the District of New Mexico. These factors, therefore, establish by a preponderance of the evidence that the Defendant is a flight risk.

**III.    CONCLUSION**

For the reasons stated above, there is clear and convincing evidence that the Defendant is a danger to the community as well as a preponderance of the evidence that no available conditions or combination of conditions would reasonably assure the Defendant's appearance at trial. The United States, therefore, respectfully requests that the Court detain the Defendant pending trial.

Respectfully submitted,

JONATHAN D. ROSS
United States Attorney


STEPHANIE MAZZANTI
Bar No. 2006298
Assistant United States Attorney
P. O. Box 1229
Little Rock, Arkansas 72203
501-340-2600
Stephanie.Mazzanti@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

LAURA GILSON
Trial Attorney
U.S. Department of Justice
Civil Rights Division, Criminal Section
150 M. Street NE
Washington, DC 20530
(202) 598-1141


ALEXANDER M.M. UBALLEZ
United States Attorney
District of New Mexico


KIMBERLY BRAWLEY
Assistant United States Attorney
P.O. Box 607
Albuquerque, NM 87102
(505) 224-1491

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA    )
                                   )
   v.                         )    No. 4:23-MJ-14 JTK
                                   )
MARQUET JOHNSON           )

## WAIVER OF DETENTION HEARING
## IN THIS DISTRICT WITHOUT PREJUDICE

Defendant waives a detention hearing without prejudice to raise the issue in the District of New Mexico.

Defendant gets one real shot at a detention hearing. It should logically be where he is indicted. Defense counsel's experience in *United States v. Kindley,* 4:17-CR-267–DPM (E.D. Ark. 2018)[1] cited in Doc. 5 at 21, dictates to him that this issue should be pursued by his New Mexico trial counsel, not counsel on a Rule 5 where the dangerousness issue will be contested and risk prejudicing his full presentation of that issue in New Mexico. And this is with knowledge of the fact defense witnesses on the question of release may be in Arkansas. They could probably testify by video if necessary, so distance is not as great an impediment it once was.

Respectfully submitted,

JOHN WESLEY HALL
  Ark. Bar No. 73047
1202 Main Street; Suite 210
Little Rock, Arkansas 72202-5057
(501) 371-9131 / fax (501) 378-0888
e-mail:  ForHall@aol.com
  *Attorney for Defendant*

---

[1] Since affirmed on the merits in *United States v. Kindley,* 2022 WL 17245115 (8th Cir. Nov. 28, 2022) (per curiam).  Moreover, Kindley was sentenced to two life sentences plus five years for the firearm with two victims, and several 413 witnesses.
Defense counsel didn't enter *Kindley* until mid-2019, but he's familiar with the whole case.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

**United States of America**                                              **Plaintiff**

**v.**                              **Case No.: 4:23–mj–00014–JTK**

**Marquet Johnson**                                                       **Defendant**

---

# NOTICE OF HEARING

PLEASE take notice that a Initial Appearance has been set in this case for February 6, 2023, at 10:15 AM before Magistrate Judge Jerome T. Kearney in Little Rock Courtroom # 4C in the Richard Sheppard Arnold United States Courthouse located at 600 West Capitol Avenue, Little Rock, Arkansas.

**DATE:** February 3, 2023                    AT THE DIRECTION OF THE COURT
                                               TAMMY H. DOWNS, CLERK

                                    **By:**  LaShawn M Coleman, Deputy Clerk

Electronic copy provided to:

U.S. Marshals Service, Eastern District of Arkansas
U.S. Probation Office, Eastern District of Arkansas
Court Security Office, Eastern District of Arkansas

# IN THE UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF ARKANSAS

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

      **vs**                      **4:23-MJ-00014-1-JTK**

**MARQUET JOHNSON,**

      **Defendant.**

## <u>ORDER APPOINTING COUNSEL</u>

Based upon the completed affidavit or testimony of defendant Marquet Johnson, concerning their financial ability to employ counsel, Marquet Johnson is entitled to counsel, but cannot afford to hire a private lawyer.

IT IS THEREFORE ORDERED that John Wesley Hall, Jr is appointed to represent Marquet Johnson in all further proceedings.

IT IS SO ORDERED this date of 2/6/2023.

                               /s/ Jerome T Kearney

                          _____

                          UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

UNITED STATES OF AMERICA                                             PLAINTIFF

V.                          E.D. Ark. Case No. 4:23-mj-00014-JTK-1
                            Dist. N.M. Case No. 1:23-CR-00092-KWR

MARQUET JOHNSON                                                      DEFENDANT

## ORDER

Pursuant to the Due Process Protections Act, the Court confirms the United States'
obligation to disclose to the Defendant all exculpatory evidence—that is evidence that favors the
defendant or casts doubt on the United States' case, as required by *Brady v. Maryland*, 373 U.S.
83 (1963), and its progeny, and ORDERS the United States to do so. Failure to disclose
exculpatory evidence to the defense in a timely manner may result in consequences, including, but
not limited to, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt
proceedings, disciplinary action, or sanctions by the Court.

SO ORDERED this 6th day of February, 2023.

_____
UNITED STATES MAGISTRATE JUDGE

AO 94 (Rev. 06/09) Commitment to Another District

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Arkansas

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Marquet Johnson | ) | Case No.   4:23-mj-00014-JTK-1 |
| | ) | |
| | ) | Charging District's |
| _Defendant_ | ) | Case No.   CR 23-0092-KWR |

### COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the _____ District of   New Mexico              ,

_(if applicable)_   Albuquerque, New Mexico       division.  The defendant may need an interpreter for this language:

_____ .

The defendant:      ☑ will retain an attorney.

☐ is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant.  The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled.  The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date:      02/06/2023            _____

_Judge's signature_

Jerome T. Kearney, U.S. Magistrate Judge

_Printed name and title_

## LaShawn Coleman

**To:** NMDml_CMECF InterDistrict Transfers
**Subject:** Marquet Johnson - Transmitting Rule 5(c)(3)
**Attachments:** Marquet Jones Rule 5 docs.pdf

USA v. Marquet Johnson

Subject: Transmitting Rule 5(c)(3)

Good afternoon:

Attached is a copy of the certified docket sheet for 4:23-mj-000147-JTK-1regarding CR-23-0092-KWR. Any other documents needed can be downloaded directly from Pacer.

Thank you,

/s/ LaShawn M. Coleman

